UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAMON PITTS,

    Plaintiff,

vs.

Case No. 05-CV-71436
HON. GEORGE CARAM STEEH

KONE, INC.,

    Defendant.
_____/

OPINION AND ORDER
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case arises out of the termination of plaintiff Damon Pitts' employment as a sales representative by defendant Kone, Inc. Plaintiff alleges that he was discriminated against on the basis of race and that his termination was a result of having complained about the same to management, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and Michigan's Elliott-Larsen Civil Rights Act. Defendant Kone, in its motion for summary judgment, denies any discrimination on its part and maintains the termination was solely the result of an office consolidation. A hearing on the motion was held on August 30, 2006. For the reasons set forth below, Kone's motion for summary judgment will be DENIED.

**Factual Background**

Kone is in the business of manufacturing, selling, installing, and servicing escalators and elevators. Kone is subdivided on a geographical basis into regional, state, and branch areas of operation, including two branch offices in Michigan - one in Livonia and the other in Grand Rapids. Wayne Dowty, the Regional Director of Kone in charge of a territory that includes Michigan, Indiana, Ohio, Kentucky, and West Virginia

admitted that Pitts was the only black salesperson in the entire region. (Dowty dep., pp. 4-5) Pitts started working at Kone's Detroit branch as a salesperson in September, 2000. Initially, he reported to Tim Plowman, the Detroit sales manager, and Tim Lingris, the Detroit branch manager. (Pitts dep., p. 16) Plowman and Lingris left sometime in 2001. At that time, Jeremy Metzger replaced Plowman and Doug Jasper replaced Lingris. (Pitts dep., p. 16)

According to plaintiff, co-workers Norm Price (the maintenance manager), Rob Sovis, and Mike Sovis made comments such as, "Who [does] this black guy think he is?" (Pitts dep., pp. 26-7) Plaintiff also alleges that he would hear co-workers making statements regarding black people "all the time," referring to them as "you people," i.e. "Why do you people do this; why do you people do that?" (Pitts dep., p. 28) Plaintiff asserts that this activity started within two or three months of his employment, and that it led to a "lack of support" from co-workers. (Pitts dep., p. 28) Plaintiff also asserts that despite co-workers making his job more difficult to perform because of his race, he was still "the top sales guy in Michigan" because of hard work. (Pitts dep., pp. 37-8) Plaintiff further asserts that although he tried to avoid making the situation worse by complaining to management and risk being labeled as a troublemaker, the lack of support became such a problem that he had a conversation about it with Metzger sometime in 2002, or roughly a year and half into the job. (Pitts dep., pp. 29-30)

As a result of this complaint, a meeting concerning the lack of support was called between Pitts, Metzger, Jasper and Price. Both parties agree that the issue of race was not raised at this meeting. According to plaintiff, Jasper simply heard both sides of the story about the supposed lack of support and did not come to any conclusion as to what was going on. (Pitts dep., p. 33) Plaintiff alleges that a week after this meeting, he

indicated to Jasper in a conversation that things had gotten worse, and that Jasper simply "walked away." (Pitts dep., pp. 35, 37)  According to plaintiff, Jasper generally treated Pitts like a non-human, namely "some type of individual that he really didn't have to deal with" because of his race.  (Pitts dep., p. 17)  Plaintiff also alleges that he had a similar conversation with Metzger, and that Metzger's reaction was to ignore the issue. (Pitts dep., p. 37)

Plaintiff alleges that Pitts complained to Metzger on several more occasions. Plaintiff also alleges that Metzger, when available, would go along on surveys in order to provide the support that Pitts' co-workers were supposed to provide.  According to plaintiff, on two occasions Metzger did not provide any assistance to Pitts during the meetings with clients (one with Wayne State University, another with Ford Motor Company), but instead took over the meetings and stole the sales pitch.  Plaintiff alleges that when he confronted Metzger about this conduct after the Wayne State University bid (sometime in the summer of 2002), Metzger said "You people don't know how to talk in this type of situation."  (Pitts dep., p. 54)  Plaintiff also alleges that when he confronted Metzger about this conduct after the Ford Motor Company bid (sometime toward the end of 2002), Metzger said "I did it again," trying to play it off as something that happened by accident.  (Pitts dep., p. 59)

Sometime in November of 2002, Metzger created a memorandum for Dowty indicating that Pitts had complained about being treated "differently," although why Pitts felt this way was not mentioned.  (Dowty dep., pp. 15, 17, 21)  However, Metzger did mention in the memo that Pitts had stated that "if he felt that he needed to leave the company over these issues, he would get 'much higher' people involved than myself and he had talked with people," who Metzger believed may have been attorneys.

(Dowty dep., p. 18)  Despite this, Dowty never undertook any type of investigation regarding disparate treatment in the Detroit branch office.  (Dowty dep., pp. 17-8)

Metzger's memo to Dowty also indicated that Pitts was interested in a vacant service sales manager position in the Detroit branch, which became open in January of 2003, when Metzger replaced Jasper as branch manager.  (Dowty dep., p. 21, and Pitts dep., p. 72)  Plaintiff alleges that he was not given consideration for that position, and that Mike Ramandanes, a Caucasian person who had no experience in elevator sales, was given the job instead.  (Dowty dep., pp. 13-4)  Although Kone did not formally give Ramandanes the title of "service sales manager" until March of 2005, Dowty admitted that the actual duties of the job had been given to him well before that time.  (Dowty dep., p. 54)  Plaintiff also alleges that in stark contrast to the way he was treated, co-workers gave a tremendous amount of assistance to Ramandanes.  (Pitts Affidavit, ¶ 12)

In March of 2003, an opening in the sales area became available in the Grand Rapids branch and was offered to Pitts by Metzger, with Dowty's support.  (Pitts dep., pp. 73-4)  For his part, Dowty stated during his deposition that he "made the decision to transfer Damon [Pitts] from Detroit to Grand Rapids."  As an incentive, Pitts was offered a $5,000.00 one-time bonus, and an increase in pay of $84.00 a year (to a base salary of $60,000.00 a year).  (Pitts dep., p. 79)  Plaintiff alleges that he was reluctant to accept the job transfer because he had heard rumors that the Grand Rapids branch was unprofitable and likely to be eliminated or reduced.  (Pitts Affidavit, ¶¶ 14-7)  Plaintiff also alleges that Pitts raised this issue and that Dowty assured him that the rumors were untrue.  (Pitts dep., p. 75)  According to plaintiff, he accepted the job transfer because of the treatment he received in the Detroit branch, and he did not want to

4

refuse fearing he would never be considered for a future promotion. (Pitts dep., p. 80)

Plaintiff alleges that after he moved to the Grand Rapids branch in April of 2003, it became quickly apparent that he had been misled, in that the office had problems. (Pitts Affidavit, ¶ 17) Plaintiff also alleges that when he saw Dowty at a company training event during July of 2003, he indicated to Dowty that he had been misled and requested that he be transferred back to his position in Detroit. (Pitts Affidavit, ¶ 17) Dowty acknowledged that a conversation had occurred during the Summer of 2003, but denied that Pitts requested a transfer back to his position in Detroit. (Dowty dep., pp. 27-8) According to plaintiff however, he was refused a transfer back to the Detroit branch or any other branch despite open and posted positions being available. (Pitts Affidavit, ¶¶ 21-2)

Plaintiff alleges that the racial hostility did not end after he moved to the Grand Rapids branch, and that Rina Sellers in particular, a salesperson over whom Pitts was supposed to have supervisory authority, made it clear that she resented having to work with Pitts. (Pitts Affidavit, ¶ 18) Plaintiff also alleges that Sellers sent emails, regarding Pitts, to Dowty, indicating that "everyone has an attitude toward him [Pitts] because of his skin color is what he says." (Dowty dep., pp. 45-6) Despite this, Dowty did not undertake any investigation of any racial issues in the Grand Rapids branch, but simply concluded that "Damon [Pitts] and Rina [Sellers] were not getting along." (Dowty dep., p. 44) According to plaintiff, Sellers had not only been a poor performer in Grand Rapids branch prior to Pitts moving to that office, but when Pitts was there her work habits were lackadaisical and her sales performance was sub-par. (Pitts Affidavit, ¶¶ 2, 18, 25-6) Plaintiff alleges that the branch manager, Dan Horvath, had told Pitts that Sellers had been a poor performer for a long time and that she was a problem

employee.  Id.

On December 3, 2003, Pitts was terminated without advance notice.  (Dowty dep., p. 37)  At that time, Pitts was advised that the sales operations of the Grand Rapids branch were being consolidated with those of the Detroit branch, and that there would be no salespersons in the Grand Rapids branch.  (Pitts Affidavit, ¶¶ 19, 23-4)  Plaintiff alleges that this allowed Kone to not only get rid of Pitts, who had been complaining about discrimination, but also Sellers, who had long been a poor performer.  Id.

According to plaintiff, the decision to terminate the sales function in the Grand Rapids branch was not motivated, as claimed by Kone, by the decision of Horvath to retire.  (Dowty dep., pp. 55-6)  Plaintiff alleges that despite Dowty advising Pitts that the Grand Rapids branch was consolidating with the Detroit branch, the Grand Rapids branch never closed and that Horvath, who had indicated that he was retiring, immediately came back as a sales person in the Grand Rapids branch.  (Dowty dep., pp. 29-30)  Plaintiff also alleges that other salespeople were later hired to staff the Grand Rapids branch.  (Dowty dep., pp. 32-4)  The current manager of the Grand Rapids branch has acknowledged that several salespeople were hired following Pitts' termination, both in the Detroit branch and the Grand Rapids branch, and that there has been a high turnover in salespersons.  (Baldwin dep., pp. 6, 7, 9, 15)

Plaintiff alleges that when Dowty appeared in the Grand Rapids branch and indicated that the sales function in that office was being eliminated, Pitts, as he had done before, asked for a transfer back to Detroit or another branch (which had posted openings), which was denied.  (Pitts Affidavit, ¶¶ 21-2)  Dowty admitted that Pitts requested a transfer.  (Dowty dep., pp.34-5)  Plaintiff also alleges that despite being a

6

good performer who met his sales quotas and had substantial experience in the elevator industry, he was never offered another sales position with the company, even in light of the high turnover in salespeople.

## Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)

(emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## Analysis

### I. Race Discrimination

One way to establish a claim of employment discrimination on the basis of race under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, or the Elliott Larsen Civil Rights Act, MCLA 37.2101, is if a plaintiff first establishes a prima facie case of discrimination by showing (1) that he was a member of a protected class, and (2) that, for the same or similar conduct, he was treated differently than one who was not a member of the protected class. Sisson v. U of M Regents, 174 Mich. App. 742, 746-47 (1989); see also Singal v. GMC, 179 Mich. App. 497 (1989).

In order to succeed in establishing a prima facie case of discrimination, a plaintiff has the initial burden of proving discrimination by a preponderance of the evidence. Reisman v. Regents of Wayne State Univ., 188 Mich. App. 526, 538 (1991). In a claim of disparate treatment, plaintiff must prove a prima facie case using evidence which

"consists of facts sufficient to sustain the inference that the challenged action of the employer was motivated by impermissible considerations." Hatton v. Ford Motor Co., 508 F.Supp. 620, 623 (D.C. Mich., 1981) (quoting Mosby v. Webster College, 563 F.2d 901 (8th Cir. 1977)).  Although "proof of discriminatory motive is critical... it can in some situations be inferred from the mere fact of differences in treatment." Hatton, 508 F.Supp. at 623 (quoting Int'l Brotherhood of Teamsters v. U.S., 431 U.S. 324 (1977)).  Thus, a prima facie case can be made by "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those acts were bottomed on impermissible considerations." Hatton, 508 F.Supp. at 623 (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978)).

Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate non-discriminatory reason for the presumptively discriminatory treatment. Reisman, 188 Mich. App. at 539 (citing Sisson, 174 Mich. App. at 746).  Once the employer has come forward with a non-discriminatory explanation for the adverse employment decision, "the presumption drops away and the plaintiff [must] show by a preponderance of admissible direct or circumstantial evidence, that there is a triable issue that the employer's reason's were not true reasons, but were a mere pretext for discrimination." LaMont v. MSX Int'l., 63 F.Supp.2d 778, 780 (E.D. Mich. 1999).

Plaintiff's race discrimination claim is premised on his deposition testimony that he was subject to a racially hostile workplace where he was denied the support that his similarly situated white counterparts received and was required to put up with numerous "you people" comments and statements such as "who does this black guy think he is?"

9

The actions and comments of Pitts' managers and co-workers were not isolated and sporadic, but, as explained by Pitts, occurred constantly, despite his complaints, causing the situation to become overwhelming.  Metzger, the branch manager at the time, documented that Pitts stated that "if he felt that he needed to leave the company over these issues, he would get 'much higher' people involved than myself and he had talked with people," who Metzger believed may have been attorneys.

When an employer is on notice of a racially hostile work environment or one tainted by discriminatory animus, the employer may not turn a blind eye to the same. Under both federal law and Michigan's ELCRA, an employer in such circumstances is obligated to promptly take an investigation of the same and provide remedial measures. Grow v. W.A. Thomas Co., 236 Mich. App. 696, 699-702 (1999); Risinger v. Ohio Bur. Of Workers' Comp, 883 F.2d 475, 482-3 (6th Cir. 1989) (employer has duty to undertake prompt investigation and provide remedy after being on notice of racial harassment or discrimination); EEOC v. Beverage Caners, Inc., 897 F.2d 1067, 1070 (11th Cir. 1990) (Title VII violated where management was on notice of discriminatory comments or actions of workers "but did nothing to correct the situation").

Considering Metzger's memo was sent to Dowty, the regional director, who admitted that Pitts was the only black salesperson in the entire region that he knew of, it would strain credulity for Kone to suggest that it was not on notice of racial discrimination issues raised by Pitts.  As the Michigan Supreme Court has stated, a person "has no right to shut his eyes or ears to avoid information, and then say he had no notice."  Fortney v. Tope, 262 Mich. 593, 597 (1933).  Metzger's own documentation sent to Dowty referred to the fact that Pitts had complained of disparate treatment and raised the specter that the matter was so severe that he might need to "leave the

company over these issues" and pursue legal remedies.  For his part, Pitts indicated that he specifically complained regarding racially disparate treatment.

In addition, despite the fact that Pitts was interested in and qualified for the open sales manager position in the Detroit branch, he was not given consideration for the same and the job was instead provided to Mike Ramandanes, a Caucasian friend of Metzger, who had recently been brought into the company in elevator sales despite no prior experience.

After being put on notice of potential racial discrimination or harassment, Kone did not fulfill its federal and state duties to investigate the same and take remedial action.  Dowty admitted on deposition that no investigation of any kind was done.  Instead, Dowty simply "made the decision to transfer Damon [Pitts] from Detroit to Grand Rapids," instead of conducting any investigation into the racial discrimination in the Detroit branch.  His decision was adverse to Pitts' employment because the Grand Rapids branch was smaller, less prestigious, considered only a sub-branch, and an unprofitable one at that.  The racially disparate treatment continued in the Grand Rapids branch and, again, despite Dowty receiving an email indicating that Pitts felt that he was being treated differently on account of his race, Kone did not undertake any investigation.

Not long after Pitts was transferred to the Grand Rapids branch, he was advised that the sales functions in Grand Rapids were being discontinued and his job eliminated.  There is enough evidence to support the inference that closing the Grand Rapids branch allowed Kone to terminate Pitts without ever investigating the specter of race discrimination raised by the only black salesperson hired in the entire multi-state region operated under Dowty.  Despite acknowledging high turnover among

11

salespeople within the region at Kone, defendant denied Pitts a transfer to any other Kone office without explanation. Kone cannot claim the decision was a result of plaintiff's inadequacies because it has been admitted that Pitts was capable and adequate.

Moreover, the "reorganization" of the Grand Rapids branch is in serious question. Based on the evidence, a jury could determine that the so-called "reorganization" that was used to eliminate Pitts from employment was a pretext. First of all, the alleged impetus for the reorganization was the retirement of Grand Rapids branch manager, Horvath. In fact Horvath did not retire and continued working in a sales capacity after Pitts was terminated. Moreover, despite telling Pitts that the sales functions were being eliminated in the Grand Rapids branch, Kone thereafter hired additional salespeople to cover the west side of the state.

Where an employer raises pretextual reasons for job actions (such as Kone's claim that it was eliminating all sales functions in the Grand Rapids branch), a jury submissible issue of discrimination is presented. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) ("Under this common sense principle, evidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking actual, illegal motivation") (Ginsberg, concurring)).

In the present case, Kone acknowledges there was high turnover in the region for salespersons. Even assuming that the elimination of the sales functions in the Grand Rapids branch was bona fide (which is highly questionable given that the sales functions resumed following Pitts' termination), it strains credulity that Pitts would not have been offered a transfer to another office in light of his having been a high

12

performing employee, and there existing available posted openings.

When all the facts are viewed in a light most favorable to Pitts, Pitts has presented triable race discrimination claims pertaining to both hostile environment and racially motivated termination.

## II. Retaliation

Both federal and state law prohibit an employer from retaliating against an employee who has made a complaint or otherwise raised the specter of race discrimination. This includes internal complaints or merely opposing discriminatory practices. Singfield v. Akron Metro Housing Authority, 389 F.3d 555, 562-3 (6th Cir. 2004) (under Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a)); McLemore v. Detroit Receiving Hospital, 196 Mich. App. 391, 396-7 (1993) (under the Michigan ELCRA's anti-retaliation provision, MCL 37.2701).

In order to set forth a triable case of unlawful retaliation, a plaintiff must demonstrate that (1) he engaged in protected activity by opposing any discriminatory action or making a complaint regarding the same; (2) that the employer had knowledge of his protected activity; (3) that the employer subjected him to some adverse employment action; and (4) that there exists a causal connection between the protected activity and the adverse employment action. Id.

In order to establish the final prong of a retaliation claim, there must be more than a mere "causal link" between the protected activity and the adverse employment decision. A "plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity. Allen v. Michigan Dep't of Corrections, 165 F.3d 405, 413 (6th Cir. 1999).

If a plaintiff establishes a prima facie case of retaliation, then the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792-93 (6th Cir. 2000). The plaintiff must then demonstrate that the proffered reason is not the true reason and was mere pretext for discrimination. Id.

The first two elements of an unlawful retaliation claim can hardly be disputed here. Not only has Pitts indicated that he opposed discriminatory practices and complained regarding the same, but Kone's own internal memoranda provides corroborating evidence, including statements to the effect that Pitts had complained of disparate treatment so severe that he was considering resignation and pursuit of legal remedies. Relying on this evidence, a reasonable jury could easily find that the first two elements of the retaliation claim have been shown.

A closer question is presented on the issue of whether Pitts was subject to adverse employment action, but upon careful review it is clear that Pitts meets this element also. Viewed in a light most favorable to Pitts, Kone took adverse action against him by (1) failing to investigate his complaints of discrimination, (2) transferring him to a less prestigious and lucrative branch, (3) terminating his employment, and (4) refusing his request for a transfer to an open sales position at another branch. As indicated in Pitts' affidavit, the transfer to the Grand Rapids branch (a "decision made by" Dowty, the regional director) was adverse to him because of numerous factors, including inconvenience of relocating, lowered opportunities for advancement in the office, lower prestige associated with the Grand Rapids branch, and the lower financial profile of the office. Although Kone provided him with a one-time bonus of $5,000.00 in connection with the transfer and a nominal pay increase, these factors are not

14

dispositive.    As the Court noted in Smith v. Chrysler Financial Corporation, 101 F.Supp.2d. 534, 544 (E.D. Mich. 2000), the "increase in actual potential pay and benefits is not dispositive, especially in this unique situation..." 101 F.Supp.2d. at 544. As indicated by the Court in Smith, there are sometimes "other indices unique to the situation" that can make what is otherwise a lateral transfer or reassignment an "adverse employment action." Id.  Reassignment or transfer even with the same pay, depending on the "indices... unique to [the] particular situation" can be considered adverse employment actions, such as transferring someone to "some retched backwater." White v. Burlington Northern & Sante Fe Railroad Co., 364 F.3d. 789, 803-4 (2004).

Although one cannot fairly characterize the Grand Rapids branch as "some kind of retched backwater," it was, by various objective standards, a far less desirable office than the Detroit branch.  Dowty, the regional director, acknowledged that within a few months of Pitts being transferred to the Grand Rapids branch, Pitts confronted him at a meeting indicating that he felt he had been misled regarding the transfer because the Grand Rapids branch was not profitable and was in a state of disarray.  (Dowty dep., pp. 27-8; Pitts Affidavit ¶ 17).  Thus, when viewed in a light most favorable to Pitts, the transfer to the Grand Rapids branch could be viewed as an adverse employment action regardless of the title given to Pitts at that office and regardless of the fact he did not receive an immediate pay decrease.  Indeed, the transfer to the Grand Rapids branch could be viewed by a reasonable jury as the death knell of Pitts' employment, given that, if Kone's position is to be believed, the sales on the west side of the state were so poor that the entire sales functions  of the Grand Rapids branch was eliminated within approximately seven months of Pitts' transfer to that location.  Moreover, the refusal to

allow Pitts to transfer to an open and posted sales position at another branch was clearly an adverse employment action as it resulted in Pitts being jobless.

The forth and final element of the retaliation claim requires the showing of a "causal connection" between the adverse employment action and the protected activity. However, the Sixth Circuit has noted that the burden of establishing a prima facie case of retaliation is "not onerous." EEOC v. Avery Tennyson Corp., 104 F.3d. 858, 861 (6th Cir. 1997).

Retaliation can be shown through circumstantial evidence. McLemore, at 396-7 (noting that "barrage of criticism of plaintiff's work job performance" after plaintiff's harassment complaint was circumstantial evidence of retaliatory motive); Roulston v. Tendercare (Michigan), Inc., 239 Mich. App. 270, 280-1 (2000); Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) (quoting from an earlier case noting that "[c]ircumstantial evidence [of an employer's motive] is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence"); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000); Moore v. Kuka Welding Systems, Inc., 171 F.3d. 1073, 1080 (6th Cir. 1999). This can include the timing of adverse actions taken against employees. Singfield, 389 F.3d. at 563; Moore; Moon v. Transport Drivers, Inc., 836 F.2d. 226, 229 (6th Cir. 1987).

In the present case, when the facts are viewed in a light most favorable to Pitts, a reasonable jury could conclude that there was a "causal connection" between his protected activity and the adverse actions. Pitts raised the specter of racial discrimination and harassment in the Detroit branch and Kone failed in its obligation to investigate the same and provide remedial measures. Instead of investigating Pitts' complaints of racial hostility and disparate treatment, Kone transferred Pitts to the west

16

side of the state to a failing office. As the Sixth Circuit noted in Singfield, the temporal proximity of adverse action to protected activity "gives rise to an inference of retaliation" and is almost always sufficient to defeat summary judgment. 389 F.3d. at 563. Here, as acknowledged by Kone's own internal memoranda, prior to Pitts' transfer to the Grand Rapids branch, the situation had become so severe that Pitts was discussing the possibility of resigning from employment and retaining counsel to pursue the company. As shown by Pitts' affidavit, the decision to transfer him to the Grand Rapids branch came close on the heels of his complaints of discrimination. Based on this evidence, a reasonable jury would certainly be free to find that there was a "causal connection" between Kone's decision to transfer Pitts and his complaints of discrimination.

Moreover, terminating Pitts' employment and refusing to offer him another position, or even transfer him to another branch as he had been requesting, undisputedly constitute adverse actions. When viewed in the light most favorable to Pitts, a reasonable jury could find that these actions were also causally connected to Pitts having raised the specter of race discrimination and harassment.

When the available evidence is viewed under the appropriate standard, in the light most favorable to the nonmoving party, there does indeed exist genuine issues of material fact, which require submission to a jury.

## **Conclusion**

For the reasons set forth above, defendant Kone's motion for summary judgment is hereby DENIED.

SO ORDERED.


Dated: October 16, 2006

                                                S/George Caram Steeh
                                                GEORGE CARAM STEEH
                                                UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
October 16, 2006, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk

---